IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| BLAIR DOUGLASS,<br><br>                  Plaintiff,<br><br>     v.<br><br>LINKSOUL, LLC,<br><br>                  Defendant. | Civil Action No.   2:20-cv-533<br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Blair Douglass ("Mr. Douglass" or "Plaintiff") seeks a permanent injunction requiring a change in Linksoul, LLC ("Linksoul" or "Defendant") corporate policies to cause its online store to become and remain accessible to individuals who are partially sighted, visually impaired, or totally blind. In support thereof, Mr. Douglass respectfully asserts as follows:

**INTRODUCTION**

1.      Mr. Douglass lives in Pittsburgh, Pennsylvania. He works for an area university as a Program Administrator, managing all phases of the admission process for a highly competitive science training program, among other things. *See* LinkedIn, Blair Douglass, https://www.linkedin.com/in/blair-douglass-a0700871 (last accessed Apr. 14, 2020). Mr. Douglass is also a licensed Pennsylvania attorney. He graduated from the University of Pittsburgh School of Law. During his enrollment at Pitt Law, Mr. Douglass completed a judicial internship in the United States District Court for the Western District of Pennsylvania. *Id.*

2.      Mr. Douglass is blind and has advocated for individuals with visual impairments his entire life. *See* Treshea N. Wade, *Blindness doesn't keep teen from success*, Trib Total Media, LLC, May 30, 2005, https://archive.triblive.com/news/blindness-doesnt-keep-teen-from-success/

(last accessed Apr. 14, 2020) ("I am not striving necessarily for perfection, but I just want to do well[.] …Sure I have a disability. But it's a disability that anyone can readily overcome with a lot of hard work."); Zak Koeske, *Pitt student aims to rise above stereotype*, Pittsburgh Post-Gazette, July 23, 2009, https://www.post-gazette.com/local/south/2009/07/23/Pitt-student-aims-to-rise-above-stereotype/stories/200907230364 (last accessed Apr. 14, 2020) ("Blindness can't hold you back from doing anything you want to do[.] …Blindness is simply a physical condition. You have to make a few adaptations, but those aren't big enough to affect your ability to do a job competently. …There are always going to be some people who doubt your ability. ... I have no trouble trying to prove them wrong.").

3.      As a result of his blindness, Mr. Douglass relies on screen reader auxiliary aids, including JAWS 2020 from Freedom Scientific and VoiceOver with iOS, to access digital information, like a Microsoft Word document, an email, or a website.

4.      A screen reader auxiliary aid "translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id.*; *See also* American Foundation for the Blind, *Screen Readers*, https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers (last accessed Apr. 14, 2020) (discussing how screen readers work).

5.     Linksoul is retailer that sells bags, apparel, and other accessories direct to consumers. Unlike retailers 30-years ago, Linksoul does not operate a brick-and-mortar retail storefront which Mr. Douglass, who resides in Pittsburgh, may visit in person. If Mr. Douglass wants to purchase products from Linksoul directly, he must do so online.

6.     In order to research and purchase the products that Linksoul sells, consumers may visit Linksoul's online store, located at https://linksoul.com/ (the "Digital Platform"), which Digital Platform Linksoul owns, operates, and controls. *See* Linksoul, Privacy Policy & Terms of Use, https://linksoul.com/pages/privacy-policy-terms-of-use (last accessed Apr. 14, 2020).

7.     Linksoul is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.

8.     Unfortunately, Linksoul denies approximately 8.1 million Americans who have difficulty seeing access to the Digital Platform's goods, content, and services because the Digital Platform is incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world. *See* Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports, *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed Apr. 14, 2020) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see."); Emily Heaslip, U.S. Chamber of Commerce, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping* (Jan. 6, 2020),

https://www.uschamber.com/co/run/technology/building-mobile-friendly-ecommerce-websites

("New research by Leanplum found that 95% of consumers will buy at least half of their gifts online.") (last accessed Apr. 14, 2020).

9.     Mr. Douglass brings this civil rights action against Linksoul to enforce Title III, which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading auxiliary aid—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

10.     By failing to make its Digital Platform, a service of a public accommodation subject to Title III, available in a manner compatible with screen reader programs, Linksoul deprives individuals who are partially sighted, visually impaired or totally blind the benefits of the goods, content, and services of its online store—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

11.     Because Linksoul's Digital Platform is not and has never been accessible, and because upon information and belief Linksoul does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Digital Platform to become and remain accessible, Mr. Douglass invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring that:

4

| Compl. ¶ | Relief Requested | Defendant's Deadline to notify Plaintiff's counsel of completion |
|---|---|---|
| 11(a) | Defendant retain a qualified consultant acceptable to Plaintiff ("Approved Accessibility Consultant") who shall assist it in improving the accessibility of its Digital Platform, including all third-party content and plug-ins, so the goods and services on the Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities. | 30-days of Court's Order |
| 11(b) | Defendant work with the Approved Accessibility Consultant to ensure that all employees involved in digital development are given accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages. | 180-days of Court's Order and every 180-days thereafter until the Court orders otherwise |
| 11(c) | Defendant work with the Approved Accessibility Consultant to perform an automated accessibility audit on at least a quarterly basis to evaluate whether Defendant's Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis. | 90-days of Court's Order and every 90-days thereafter until the Court orders otherwise |
| 11(d) | Defendant work with the Approved Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business online, in addition to the testing that is performed using semi-automated tools. | 90-days of the Court's Order and every 90-days thereafter until the Court orders otherwise |
| 11(e) | Defendant incorporate all of the Approved Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations. | 60-days of receiving recommendations until the Court orders otherwise |
| 11(f) | Defendant work with the Approved Accessibility Consultant to create an Accessibility Policy that will be posted on its Digital Platform, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems. | 60-days of the Court's Order |

| 11(g) | Defendant directly link to the Accessibility Policy from the header of each homepage and the footer on every other page of the Digital Platform. | 60-days of the Court's Order |
|---|---|---|
| 11(h) | Defendant accompany the Accessibility Policy with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy. | 60-days of the Court's Order |
| 11(i) | Defendant provide a copy of the Accessibility Policy to all digital content personnel, contractors responsible for digital content, and Client Service Operations call center agents ("CSO Personnel") for the Digital Platform. | 60-days of the Court's Order |
| 11(j) | Defendant train no fewer than three of its CSO Personnel to escalate calls from users with disabilities who encounter difficulties using the Digital Platform. Defendant shall have trained no fewer than three of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance. | 180-days of Court's Order |
| 11(k) | Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Digital Platform to be inaccessible to users of screen reader technology. | 180-days of Court's Order |

| | | |
|---|---|---|
| 11(l) | For a period up to two (2) years after the Approved Accessibility Consultant validates the Digital Platform is free of accessibility errors/violations, Defendant shall provide Plaintiff's Counsel with Quarterly Reports on the progress it is making toward implementing the various provisions of this Agreement, including Defendant's effort to create and implement an Accessibility Policy, testing procedures, the training of its employees involved in website or mobile application accessibility, and information regarding Defendant's continued evaluation of its provision of an accessible online store. Defendant shall also report on and provide a summary of formal grievances it receives regarding the accessibility of its online store, and shall provide a summary of its responses to such grievances to Plaintiff's Counsel. | Until the Court orders otherwise |
| 11(m) | Counsel for Plaintiff and Counsel for Defendant will hold regularly scheduled telephonic meetings within 30 days of the submission of Quarterly Reports in order to discuss ongoing progress towards the implementation of proper accessibility policies and practices. To this end, Plaintiff, through his counsel and its experts, shall be entitled to consult with the Approved Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Approved Accessibility Consultant provides Defendant. | Until the Court orders otherwise |

12.     Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website or mobile application will not cause the website or mobile application to remain accessible without a corresponding change in corporate policies related to those web-based technologies. Jonathan Lazur et al., Ensuring Digital Accessibility Through Process and Policy 140 (2015). As one leading commentator notes:

> The most significant problem is maintaining the accessibility of a large commercial site. Without policies, procedures and metrics—such as testing a release for accessibility before posting to the website and training in accessible design (so that accessibility is part of the design process the way, say, cybersecurity is)—the site's status as accessible will be temporary at best.

*Fighting for Accessible Digital Platform under the ADA: Daniel Goldstein, Brown Goldstein Levy, Baltimore*, Bloomberg BNA, Jan. 13, 2016, ISSN 1098-5190 (reproduced with permission from Electronic Commerce & Law Report, 21 ECLR, 2 (Jan. 13, 2016), https://www.browngold.com/wbcntntprd1/wp-content/uploads/BNA-Fighting-for-Accessible-Digital Platformss-Under-ADA.pdf) (last accessed Apr. 14, 2020).

13.     To evaluate whether Linksoul's Digital Platform has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause it to remain accessible, the Digital Platform must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals:

> [I]f you have planned to redesign or add a certain segment to your site, then make it accessible from the start. It's far cheaper to plan for an elevator than to decide to add one once your 30-story building is complete. Or if you are re-branding, consider using templates that will ensure accessibility. Make sure you have policies, procedures and metrics in place so that you know if you are maintaining accessibility and can identify why, if you are not. Most of all, consult disabled consumers or a consumer organization before deciding what you are going to do, and have consumers actually test the changes.
>
> Something you imagine you may need to do, you may not need to do at all or may be able to do much cheaper. Something you hadn't thought to do may be critical to accessibility. And, of course, if you work with the disability community, they will spread the word that this is no longer a site to be avoided, but to be used.

*Id.* at 3.

## JURISDICTION AND VENUE

14.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

15.     Linksoul attempts to, and indeed does, participate in the Commonwealth's economic life by offering and providing products and services over the Internet to Pennsylvania

8

residents, including Mr. Douglass. Unlike, for example, a brewery that cannot sell and ship beer to consumers in certain states, Linksoul purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Pennsylvania residents. *See Gniewkowski v. Lettuce Entertain You Enterprises*, Case No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa Apr. 25, 2017) clarified by Order of Court, ECF 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (*citing Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119 (W.D. Pa. 1997) (exercising specific personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum hotel operator); *Law School Admission Council, Inc. v. Tatro*, 153 F.Supp.3d 714, 720-21 (E.D. Pa. 2015) (exercising personal jurisdiction over out-of-forum website operator); *Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same). These online sales contracts between Linksoul and Pennsylvania residents involve, and indeed require, Linksoul's knowing and repeated transmission of computer files over the Internet.

16.     As described in additional detail below, Mr. Douglass was injured when he attempted to access Linksoul's Digital Platform from Pittsburgh, Pennsylvania but encountered barriers that denied him full and equal access to Linksoul's online goods, content, and services.

17.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Mr. Douglass's claims occurred.

## PARTIES

18.    Mr. Douglass is a natural person over the age of 18. He resides in and is a citizen of Pittsburgh, Pennsylvania, located in Allegheny County.

19.    Mr. Douglass is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq.*

20.    Defendant Linksoul, LLC is a Nevada limited liability company with a principal place of business at 530 S Coast Hwy., Oceanside, CA 92054.

21.    Based on the information available to Mr. Douglass, Linksoul has the resources to make its online store accessible to screen reader users: Linksoul sells and ships its products throughout the entire United States, including Pennsylvania, and internationally; maintains a robust social media marketing campaign, including into Pennsylvania; and has more than 57,000 followers on Instagram, including from Pennsylvania.

## FACTS APPLICABLE TO ALL CLAIMS

22.    While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website and app developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## HARM TO PLAINTIFF

23.    Mr. Douglass attempted to access the Digital Platform from Pittsburgh, Pennsylvania. Unfortunately, because of Linksoul's failure to build its Digital Platform in a manner that is compatible with screen reader auxiliary aids, including VoiceOver with iOS, Mr.

Douglass is unable to understand, and thus is denied the benefit of, much of the content and services he wishes to access.

24.     "VoiceOver is a gesture-based screen reader that lets you enjoy using iPhone even if you don't see the screen. With VoiceOver enabled, just triple-click the Home button (or the side button on iPhone X or later) to access it wherever you are in iOS. Hear a description of everything happening on your screen, from battery level to who's calling to which app your finger is on. You can also adjust the speaking rate and pitch to suit you. …You can control VoiceOver using a simple set of gestures. Touch or drag your finger around the screen and VoiceOver tells you what's there. Tap a button to hear a description, then double-tap to select. Or flick left



and right to move from one element to the next. When you interact with an element, a black rectangle appears around it so sighted users can follow along. When you prefer privacy, you can activate a screen curtain to turn off the display completely, but still hear all that VoiceOver has to say. And now with iOS 13, you can choose from a wide range of gestures and assign those you're most comfortable with to the commands you use most." *See* Apple, Accessibility, https://www.apple.com/accessibility/iphone/vision/ (last accessed Apr. 14, 2020).

25.     Below is an example of one online store's use of sufficiently descriptive alternative text to describe its products to screen reader users. *See* Custom Ink, Homepage, https://www.customink.com/ (last accessed Mar. 28, 2019). The image on the left illustrates what shoppers perceive visually when browsing Custom Ink's online store with an iPhone. To the right, is an image with alternative text highlighted in green. Although invisible to the eye, screen readers read this highlighted text aloud in order to describe the image to shoppers who cannot perceive content visually. Without this detailed alternative text, screen reader users cannot determine what goods and services are available for purchase; they cannot shop online independently.



26.     Unfortunately, as a result of visiting Linksoul's Digital Platform, and from investigations performed on his behalf, Mr. Douglass found the Digital Platform to be unusable due to various barriers that deny him full and equal access to the goods and services that Linksoul offers. For example:

a.      The Digital Platform prevents screen reader users from accessing some primary content. For example, when shoppers visit the Digital Platform from a new IP address, Linksoul displays a pop-up window inviting them to "UNLOCK 15% OFF YOUR ORDER" by signing up for its email list. Shoppers who perceive content visually can type their email into the text field that Linksoul provides in the pop-up window, then click "CONTINUE" to claim the promotion. Unfortunately, Linksoul does not alert screen readers of this pop-up window. Instead, screen readers remain focused on the content of the



Digital Platform's underlying page, making the pop-up invisible to screen reader users. As a result, it is impossible for Mr. Douglass to perceive this promotion independently, the effect of which would require him to pay more on his order than shoppers who do not use screen reader technology to shop online.

b.      Linksoul's online store allows shoppers to filter the many products that it sells. The Digital Platform displays these filter options in a pop-up window. Shoppers who perceive content visually can click various buttons in the pop-up to expedite and improve their online shopping experience, narrowing their search by color, for example. Unfortunately, the Digital Platform does not alert screen readers to this portion of the pop-up window. Instead, screen readers remain stuck on the



unrelated elements in the Digital Platform's underlying page. As a result, Mr. Douglass cannot use this important navigational tool independently.

      c.      The Digital Platform uses visual cues as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element. Providing information conveyed visually through an audio means is necessary to ensure that shoppers who cannot see can still perceive this information. For example, Linksoul places a gray "X" atop the sizes in which a particular product is unavailable. Shoppers who perceive content visually will see this visual cue and infer that the product they're researching is unavailable in the corresponding size. Unfortunately, Linksoul fails to include alternative text to also identify which sizes are unavailable, making it impossible for Mr. Douglass to discover which sizes are out-of-stock while using his screen reader.



      d.      The Digital Platform prevents screen reader users from accessing primary content. For example, the Digital Platform provides a Size Guide that shoppers may review to determine what size apparel to purchase. Size guides are particularly important to consumers who shop online because they lack the opportunity to try on products, like the apparel that Linksoul sells, before purchasing. Unfortunately, the Digital Platform prevents screen readers from tabbing to these size guides. Instead, screen readers remain focused on the content of



the Digital Platform's underlying pages. As a result, screen reader users, including Mr. Douglass, are unable to access the sizing information they require to confidently purchase apparel that will fit, making it more likely they abandon the online shopping experience before making a purchase.

e.    Shoppers who perceive content visually will notice a pop-up window after placing an item in their shopping cart. This pop-up window confirms the shopper placed the item in their shopping cart successfully and asks shoppers whether they would like to checkout. Unfortunately, Linksoul fails to notify screen readers when these pop-up windows appear. This makes it impossible for screen readers to access the pop-up's content. As a result, screen reader users, like Mr. Douglass, do not receive the confirmation and shortcut that Linksoul provides shoppers who do not use screen readers. Instead, Mr. Douglass  must tab back to the top of a webpage in order to complete a purchase. This burdensome, backward, and confusing interaction makes it more likely that Mr. Douglass will abandon the items in his shopping cart and leave the Digital Platform before completing a purchase.

27.    These barriers, and others, deny Mr. Douglass full and equal access to all of the services the Digital Platform offers, and now deter him from attempting to use the Digital Platform. Still, Mr. Douglass would like to, and intends to, attempt to access the Digital Platform in the future to research the goods and services Linksoul offers or to test the Digital Platform for compliance with the ADA. *See Heinzl v. Cracker Barrel Old Country Stores, Inc.*, 2:14-cv-1455, 2016 WL 2347367, at *21 (W.D. Pa. Jan. 27, 2016), *report and recommendation adopted as modified sub nom. Heinzl v. Cracker Barrel Old Country Store, Inc.*, 2:14-CV-1455, 2016 WL

1761963 (W.D. Pa. Apr. 29, 2016) ("[T]he weight of authority is to permit standing to a plaintiff who acts as a tester.").

28.     If the Digital Platform were accessible, *i.e.* if Linksoul removed the access barriers and implemented the practices described above, Mr. Douglass could independently research and purchase Linksoul's products and access its other online content and services.

29.     Though Linksoul may have centralized policies regarding the maintenance and operation of its Digital Platform, Linksoul has never had a plan or policy that is reasonably calculated to make its Digital Platform fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

30.     The law requires that Linksoul reasonably accommodate Mr. Douglass's disability by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

31.     Mr. Douglass has been, and in the absence of an injunction will continue to be, injured by Linksoul's failure to provide its online content and services in a manner that is compatible with screen reader technology.

## DEFENDANT'S KNOWLEDGE OF ONLINE ACCESSIBILITY REQUIREMENTS

32.     Linksoul has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

33.     In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018), https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf (last accessed Apr. 14, 2020); *see also* Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, Case No. 99-50891 (5th Cir. June 30, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf (last accessed Apr. 14, 2020) ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

34. More recently, the United States Supreme Court declined to review a Ninth Circuit decision holding that (1) Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III") covers websites and mobile applications (2) the imposition of liability on businesses for not having an accessible website and mobile application does not violate the due process rights of public accommodations. *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019) cert. denied 589 U.S. ___ (U.S. Oct. 7, 2019) (No. 18-1539).

**THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE**

35. There is no DOJ administrative proceeding that could provide Mr. Douglass with Title III injunctive relief.

36.     While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Mr. Douglass with relief.

37.     Mr. Douglass asserts violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

38.     Resolution of Mr. Douglass's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Linksoul offers content and services on its Digital Platform, and (b) whether Mr. Douglass can access the content and services fully and equally.

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

39.     The assertions contained in the previous paragraphs are incorporated by reference.

40.     Linksoul's Digital Platform is a service of a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Clark v. McCormick & Company, Inc.*, Case No. 1:19-cv-00301-AJS, Text Order, ECF 99 (W.D. Pa. Jan. 16, 2020) (Judge Schwab); *West v. DocuSign, Inc.*, 2019 WL 3843054 (W.D. Pa. Aug. 15, 2019) (J. Schwab) ("Plaintiff's allegations support a theory that she was rendered unable to access property (*i.e.*, the website) owned, operated, and controlled by Defendant. The legal argument raised by Defendant is, therefore, not supported by the Third Circuit authority which it cites, and runs contrary to decisions reached (and published) by this Court in substantially similar if not identical cases[.]"); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, 251 F. Supp. 3d 908, 916–18 (W.D. Pa. 2017) (J. Schwab); *Suchenko v. ECCO USA, Inc.*, 2018 WL 3660117, No. 18-cv-0562-AJS (W.D.

Pa. Aug. 2, 2018) (J. Schwab); and *Suchenko v. ECCO USA, Inc.*, 2018 WL 3933514, No. 18-cv-0562-AJS (W.D. Pa. Aug. 16, 2018) (J. Schwab).

41.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Linksoul does not provide Mr. Douglass with full and equal access to its Digital Platform, it has violated the ADA.

42.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

43.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

44.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

45.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has

explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

46. By failing to provide its Digital Platform's content and services in a manner that is compatible with auxiliary aids, Linksoul has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a)   denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Digital Platform;

(b)   affording individuals with visual disabilities access to its Digital Platform that is not equal to, or effective as, that afforded others;

(c)   utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)   denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)   failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

47. Linksoul has violated Title III by, without limitation, failing to make its Digital Platform's services accessible by screen reader programs, thereby denying individuals who are partially sighted, visually impaired, or totally blind the benefits of the Digital Platform, providing

them with benefits that are not equal to those it provides others, and denying them effective communication.

48.     Linksoul has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Digital Platform to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

49.     Making its online goods, content, and services compatible with screen readers does not change the content of the Digital Platform nor result in making the Digital Platform different, but enables individuals with visual disabilities to access the online store Linksoul already provides.

50.     Linksoul's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Mr. Douglass and other individuals with visual disabilities.

51.     Mr. Douglass's claims are warranted by existing law or by non-frivolous argument for extending, modifying, reversing existing law, or for establishing new law.

52.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Mr. Douglass requests relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Digital Platform is fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Digital Platform into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Digital Platform is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully in paragraph 11 above.

(C)     Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment. *See People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11); Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, Case No 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019),     https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last accessed  Apr. 14, 2020) (finding

plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case);

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

(G)     An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Respectfully Submitted,

Dated: April 14, 2020

*/s/ Kevin W. Tucker*

Kevin W. Tucker (He/Him/His)
Pa. No. 312144
Kevin J. Abramowicz
Pa. No. 320659
EAST END TRIAL GROUP LLC
186 42nd St., P.O. Box 40127
Pittsburgh, PA 15201
Tel. (412) 877-5220
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com